FILED _____ LODGED
_____ RECEIVED

**Sep 11, 2020**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   3:20-mj-05213
32421 195th Avenue SE, Kent, Washington 98042 )
More fully described in Attachment A )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
32421 195th Avenue SE, Kent, Washington 98042, more fully described in Attachment A, incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____, there is now concealed *(identify the person or describe the property to be seized)*:

Handwritten note, more fully described in Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2243 | Sexual Abuse of a Minor |
| 18 U.S.C. § 7 | Special Maritime and Territorial Jurisdiction of the United States |

The application is based on these facts:

☑ See Affidavit of Susannah Lustig, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Applicant's signature*

SUSANNAH LUSTIG, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
⊙ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: _____ 09/11/2020 _____
*Judge's signature*

City and state: _____ Tacoma, Washington _____   THERESA L. FRICKE, United States Magistrate Judge
*Printed name and title*

1
2

**ATTACHMENT A**
**ITEMS TO BE SEARCHED**

3    SUBJECT PREMISES:

4    The SUBJECT PREMISES are located on a property identified as 32421 195ᵗʰ

5    Avenue SE, Kent, WA 98042. The SUBJECT PREMISES are limited to: a two story

6    house painted white with black trim. The front upper floor has three gabled windows

7    facing the circular driveway. As viewed from the front there is an attached garage to the

8    left of the main house. The number "32421" is posted on a free-standing mailbox at the

9    entry to the circular drive.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



26
27
28

Attachment A - 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Attachment A - 2

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

The following evidence that constitute evidence, fruits and instrumentalities of violations of 18 U.S.C. § 2243 (Sexual Abuse of a Minor):  A handwritten note that Donald Kuna removed from the SUBJECT's vehicle on or after August 25, 2020.

Attachment B - 1

1

## AFFIDAVIT OF SUSANNAH LUSTIG

2

3  STATE OF WASHINGTON       )

4                            )        ss

5  COUNTY OF CLALLAM         )

6

7        I, Susannah Lustig, Special Agent, National Park Service Investigative Services

8  Branch (ISB), being first duly sworn on oath, deposes and says:

9                        **AFFIANT BACKGROUND**

10       1.      I am a Special Agent with the Investigative Services Branch of the National

11  Park Service.  I have been in the position, stationed in the Pacific Field Office since

12  January 2017.  Prior to this position, I was a uniformed U.S. Park Ranger with the

13  National Park Service for seventeen years.  I am a graduate of the Land Management

14  Basic Law Enforcement Program and Criminal Investigator Training Program at the

15  Federal Law Enforcement Training Center at Glynco, GA.  I have a Bachelor of Arts

16  degree from Stanford University.

17       2.      I have previously investigated cases of Sexual Abuse of a Minor.  Part of

18  my responsibilities as a Special Agent include investigations involving crimes against

19  children in National Parks.  As a Special Agent, I have led and/or participated in

20  investigations of a wide array of federal criminal violations including assaults, domestic

21  violence, crimes against children, firearms violations, fraud, robberies, and homicide.

22  During these investigations, I have participated in the execution of search warrants and

23  the seizure of evidence of criminal activity.  My training has included courses in law

24  enforcement techniques, federal criminal statutes, conducting complex criminal

25  investigations, physical and electronic surveillance techniques, evidence collection

26  techniques and the execution of search warrants.

27       3.      I am an investigative law enforcement officer of the United States within

28  the meaning of Title 18, United States Code, Section 2510(7), and empowered by law to

Search Warrant Affidavit, Susannah Lustig, NPS-ISB - 1

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    conduct investigations of, and to make arrests for, offenses enumerated in Title 18,

2    United States Code, Section 2243.  I am classified and trained as a Federal Law

3    Enforcement Officer with federal statutory arrest authority.

### PROPERTY TO BE SEARCHED

4        4.      This affidavit is also made in support of an Application for Search Warrant

5    to search a residence located at 32421 195th Avenue SE, Kent, WA 98042 (SUBJECT

6    PREMISES) and as described in Attachment A for evidence, fruits and instrumentalities

7    of violations of 18 U.S.C. §§ 2243 (Sexual Abuse of a Minor) and 7.

### INVESTIGATIVE SUMMARY

8        5.      I obtained the following information through personal knowledge based on

9    my participation in this investigation, through information provided to me by other law

10   enforcement officers, and through discussions with other agents and officers who are

11   familiar with this investigation. I have also participated in conducting background

12   investigations, including criminal histories, pertaining to the investigation for the offense

13   described above.  As a result, I am familiar with all aspects of this investigation.

14   However, since this affidavit is being submitted for the limited purpose of establishing

15   probable cause, I have not included each and every facet known to me concerning this

16   investigation.

17       6.      The SUBJECT PREMISES is shared by Donald and Cheryl Kuna and two

18   of their adult sons, Bryce and 36-year-old Christopher James KUNA (SUBJECT).

19       7.      On Monday August 24, 2020 a group of friends and family arrived in three

20   cars at a rental cabin at 106 Shari Drive, a cabin within the boundaries of Olympic

21   National Park (ONP), for a four-day vacation.  One car included G.F.S. and his three

22   children: a 17-year-old (G.F.J.), his 14-year-old daughter (MV1), and a 5-year-old son

23   (M.F.).  G.F.S.'s girlfriend of approximately five months, J.T. drove a separate car with

24   her two minor sons, a 9-year-old (P.T.) and 7-year-old (C.T.).  In the third car was

25   G.F.S.'s younger brother, S.F. and his 9-year-old son (R.F.).

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

8.     J.T.  had found the 106 Shari Dr. rental cabin on-line a few weeks before the trip and it contained four bedrooms and a sofa-bed in the living room.  The intention was that G.F.S. and J.T. would share a room, G.F.J. and MV1 would each have a separate room, S.F. and R.F. would share a room, and the three youngest boys would sleep in the living room on the sofa-bed and a cot.   The cabin was located within the ONP, which is federally owned government property and within the special maritime and territorial jurisdiction of the United States.

9.     A few days before the trip, G.F.S. told J.T. that he had extended an invitation to his best friend, the SUBJECT.  G.F.S. and the SUBJECT have known each other since elementary school, played sports together through high school, and became especially close friends following the SUBJECT's divorce from his wife, Samantha Lee Clark, approximately 10 years earlier.

10.     The SUBJECT is MV1's Godfather and has been a consistent presence in her life since she was born.  The SUBJECT lives in the SUBJECT PREMISES, his childhood home, with his parents approximately a half hour from the G.F.S. and his family.  G.F.S. and the SUBJECT have been active participants in a social circle that dates back to high school and also includes their respective siblings.  Over the years, the social circle has expanded to include spouses, significant others and children.  This group regularly meets and celebrates sports events and family milestones such as birthdays. The SUBJECT is regularly present at the functions and has been especially popular with the many kids in the group.  Unlike the other adults at these group functions, the SUBJECT joins the children in games and was often their center of attention.

11.     MV1 expressed she has felt particularly close to the SUBJECT as she has grown up.  She communicated with the SUBJECT independently by telephone and often sought his advice.  MV1 trusted the SUBJECT and was always happy to see him.  The SUBJECT had routinely paid more attention to MV1 than other children in the group, giving her presents more often than to others.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1        12.    The SUBJECT had periodically used sexual references with MV1.  On one

2    occasion, the SUBJECT referred to MV1's ripped jeans as "whore jeans."  He has also

3    been flirtatious with friends of MV1 similar in age to her.

4        13.    MV1 and a close family friend, S.M., have felt the amount of attention and

5    gifts the SUBJECT gave to MV1 were out of proportion from that which he gave other

6    children in the friend group.  This included the SUBJECT buying MV1 an expensive pair

7    of shoes when she expressed interest in them but not doing so for other children present

8    for the conversation.  MV1 and S.M. talked about the gift of the shoes at the time as

9    being odd.

10       14.    The SUBJECT has a reputation for being a heavy drinker, a habitual

11   marijuana user, and cocaine user.  His tendency is to binge drink.  The SUBJECT's father

12   reports the SUBJECT was hospitalized for complications from marijuana use in the fall

13   of 2019 for a couple of days.  The SUBJECT has specifically acknowledged his drinking

14   as a problem to friends and family.  In January 2020, he was arrested for Driving Under

15   the Influence.  He currently has a court-ordered interlock device installed in his vehicle.

16       15.    The SUBJECT has periodically mentioned suicidal thoughts to his family

17   and friends.  This was particularly the case during his divorce from his ex-wife.  Since his

18   divorce, he has not told his friends or family about any romantic relationships.  He has,

19   however, told G.F.S. about travelling to Las Vegas, Nevada, several times a year to hire

20   prostitutes.  Some of these conversations have taken place in front of MV1 and G.F.J.,

21   which has upset G.F.S.

22       16.    On August 24, 2020, the SUBJECT arrived at the cabin while the group was

23   making dinner.  As there was not a bedroom specifically provided for him, he had

24   planned to sleep in his car.  J.T. had been concerned about the SUBJECT's participation

25   in their vacation because of his alcohol and drug use.  She only agreed to this

26   arrangement when G.F.S. assured her that the SUBJECT would sleep in his vehicle.

27       17.    The owners of the cabin were staying in another cabin on the property.

28   One of the members of that group, Travis Obias, met the adults of the G.F.S. and his

Search Warrant Affidavit, Susannah Lustig, NPS-ISB - 4

1   family.  At the time, Obias observed that the SUBJECT was "sped up," and exhibited

2   erratic movements.  Obias suspected the SUBJECT was under the influence of a

3   controlled substance.

4        18.   After dinner, the group gathered and moved between two fire rings on the

5   lake side of the cabin.  J.T. organized marshmallows with the cohort of younger kids

6   while G.F.J., MV1, the SUBJECT and S.F. gathered around a fire pit closer to the water's

7   edge and a dock associated with the property.  Some of the group at the lower fire

8   intermittently fished.

9        19.   The SUBJECT had a bottle of whiskey and every time G.F.S. stepped away

10  from the group, the SUBJECT gave the alcohol to MV1 when G.F.S. was not looking.

11  The SUBJECT also gave some of the whiskey to G.F.J., however, MV1 had more and

12  she soon became intoxicated.  MV1 and the SUBJECT were mostly sitting in adjacent

13  chairs by the fire.  At one point, the SUBJECT took MV1 and G.F.J. out of earshot from

14  the others and told them he had been sexually assaulted as a child.  He said they were the

15  only people he had ever told.

16       20.   They eventually returned to the fire.  A short time later, G.F.J. left to go

17  into the cabin to charge his phone.  G.F.S., S.F. and the SUBJECT then went to the cabin

18  and ingested cocaine together.

19       21.   At approximately midnight, G.F.S. joined J.T. at the cabin and they went to

20  an upstairs bedroom to sleep.  After G.F.S. left, the SUBJECT gave MV1 more alcoholic

21  drinks.  Within the hour, S.F. also left the group to go to sleep.  G.F.J. came back outside

22  and observed that MV1 was very intoxicated.

23       22.   At approximately 1:00 a.m. on August 25, 2020, the SUBJECT, MV1 and

24  G.F.J. moved to the fire pit closer to the cabin.  MV1 received a FaceTime call from her

25  15-year-old friend.  The SUBJECT took the phone from MV1 and told her friend that she

26  was "pretty," "gorgeous," "beautiful" and "hot."  MV1 felt the conversation was

27  awkward.  MV1 believed her friend was also uncomfortable with these remarks and MV1

28  retrieved the phone from the SUBJECT.

23.     MV1 felt very drunk.  When MV1 started to feel nauseous, the SUBJECT put his arms around her, reaching one hand along the inside of her thigh while the other arm rested on her pelvis.  The SUBJECT continued to hold her in this way as MV1 vomited on the ground.  G.F.J. witnessed this incident and was also present when the SUBJECT later offered to "cuddle" with MV1 in her bed.

24.     G.F.J. also observed that the SUBJECT was not stumbling or slurring his words.  The SUBJECT was coherent as he and G.F.J. cleaned up the vomit.  G.F.J. had not consumed any additional alcohol since he left earlier to charge his phone and believed that he was sober.  G.F.J. had previously witnessed the SUBJECT heavily intoxicated on other occasions.  However, G.F.J. believed the SUBJECT's behavior and coherence that evening was not similar to those other occasions.

25.     The SUBJECT and G.F.J. assisted MV1 into the cabin.  Since MV1 was very drunk, they put her in the downstairs bedroom originally assigned to G.F.J. rather than take her upstairs.  The SUBJECT guided MV1 into the bedroom by holding her hips from behind with his hands and holding his body against hers.  On previous occasions when G.F.J. was heavily intoxicated, the SUBJECT had "piggybacked" him to his room.

26.     G.F.J. became increasingly suspicious of the SUBJECT based upon the manner in which he was touching MV1.  The SUBJECT then insisted on helping put MV1 into the bed and offered to stay and "cuddle" her but G.F.J. interceded because the SUBJECT's physical contact with MV1 increasingly worried him.  After MV1 was in bed, and the SUBJECT had gone to the living room, G.F.J. went upstairs to the bedroom originally intended for MV1.  G.F.J. went to bed at approximately 3:00 a.m. on August 25, 2020.

27.     The SUBJECT did not go out to his car to sleep, but rather laid down on the cot in the living room intended for M.F.  Sometime later, M.F. woke up and, realizing the SUBJECT was in his cot, began to cry.  M.F.'s cries woke up MV1 and she went into the living room to comfort him.  From upstairs, G.F.J. heard M.F.'s cries and heard MV1 go to soothe him.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

28.     As MV1 made her way to M.F., she felt less intoxicated.  She picked up
M.F. and comforted him.  While she was standing with M.F. in her arms, the SUBJECT
sat in a lounge chair next to her.  The SUBJECT then grabbed MV1's waist and pulled
her onto his lap.  P.T. awoke briefly and saw the SUBJECT holding MV1 and M.F. on
the lounge chair.

29.     The SUBJECT pushed up against MV1, rubbing his penis against her from
beneath as she held M.F.  M.F. fell asleep and MV1 put him on his cot.  The SUBJECT
then took hold of MV1's hips from behind with both hands, held his body against hers,
and walked her into the bedroom physically controlling her movements.  At  6'1" and
175 pounds, the SUBJECT was taller and stronger than MV1 who was a slender 14-year-
old.

30.     Once in the room, the SUBJECT laid MV1 on the bed and then got onto the
bed and lay behind her.  The situation felt "weird" to MV1.  She stayed turned away from
him in the bed hoping he would leave the room.  The SUBJECT held himself against her
from behind, pushing the lower half of his body against her. The SUBJECT then rolled
MV1 onto her back and took off her pants and underwear.  The SUBJECT took off his
shorts but kept his shirt on.  The SUBJECT got on top of her.

31.     The SUBJECT first put his fingers on MV1's vagina.  He then inserted his
penis into MV1's vagina.  The SUBJECT spoke to MV1 as he assaulted her, including
saying "I wish you weren't my best friend's little girl," "I've been thinking about this for
a long time" and "we have to be quiet."  He kissed her on the cheeks and lips.  He bit her
cheek.

32.     Throughout this episode, MV1 was frozen in shock and afraid.  MV1 did
not want to upset the SUBJECT.  Not knowing how to react, she held still and hoped it
would be over quickly.

33.     The SUBJECT then flipped her body over him, bent her over and put his
penis in her mouth.  The SUBJECT did not wear a condom during the assault.  The
SUBJECT held her following the assault and then he left the room.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

34.     MV1 got up and went to the kitchen for a glass of water.  The SUBJECT followed her into the kitchen and began rubbing up against her from behind again.  The SUBJECT finally left her alone at approximately 5:45 a.m. on August 25, 2020.

35.     MV1 returned to the bedroom and closed the door, sat on the bed and cried for approximately an hour and a half, not knowing what to do.

36.     At 6:33 a.m. on August 25, 2020, MV1 texted J.T., "[J.T.] as soon as u see this I need u to come 'check on me' don't tell anyone don't tell dad please just come into my room please."

37.     J.T. saw the text right away and went to see MV1.  MV1 told J.T. what had happened.  J.T. then decided to take MV1 back upstairs to be with her and G.F.S.  As MV1 walked with J.T. towards the stairs, MV1 saw the SUBJECT lying awake on the living room floor.  He made eye contact with MV1.

38.     MV1 was scared.  The SUBJECT looked as though he was panicked to see MV1 with J.T..  To MV1, the SUBJECT's expression looked both "scared" and "intimidating."  MV1 was scared of what the SUBJECT's reaction would be to her disclosure.

39.     J.T. helped MV1 shower and change.  J.T. observed a red mark on MV1's cheek below her right eye that had not been there the day before.  The mark was approximately one half inch tall by two inches wide.

40.     MV1 remained in G.F.S.'s bedroom throughout that morning.  At one point, the SUBJECT ran up the stairs and pushed his head in the door and exclaimed to MV1, "what the hell happened last night?"  MV1 was scared of the SUBJECT and pretended to be asleep.

41.     G.F.S. first encountered the SUBJECT in the morning before he knew about the assault and the SUBJECT appeared despondent and avoided eye contact with G.F.S.  The SUBJECT left the house, apparently avoiding G.F.S.

42.     Later, J.T. took G.F.S. upstairs to talk with MV1.  MV1 told G.F.S. about the assault.  MV1 recalls being terrified when she told G.F.S.  She protectively wrapped

1  herself in blankets, her eyes were glassy and red, and her mouth would not fully close.

2  She did not want to be touched.  This was not normal for MV1 who had been physically

3  affectionate with her father just the night before.  MV1 told G.F.S. she did not want him

4  to hurt the SUBJECT as she did not want her father to go to jail.

5       43.    G.F.S. then told G.F.J. about the assault while MV1 was present.  G.F.J.

6  exclaimed, "Dad, I should have known.  I just knew something was off.  [The SUBJECT]

7  was touching her all night."

8       44.    G.F.S. confronted the SUBJECT, accusing him of "raping" MV1 and told

9  him to leave.  The SUBJECT did not deny that he had assaulted MV1 saying instead,

10  "I'm so sorry," and "I hope we can get past this."  G.F.S. described the SUBJECT's

11  demeanor as: "[h]is facial expression just, like, his skin was melting off of his face, like

12  when you get caught stealing a candy bar at the store when you're a 5-year-old kid." The

13  SUBJECT also said, "I can't believe that happened, no way."  From his inflection as the

14  SUBJECT said this, G.F.S. believed the SUBJECT was acknowledging what had

15  happened.

16       45.    G.F.S. felt deeply betrayed by his long-time friend and the God-father of

17  his daughter.  In his rage, G.F.S. physically threatened the SUBJECT but cited his

18  children as a reason he would not act on his anger.  The SUBJECT appeared to be very

19  emotionally upset, fled the cabin and ran to his vehicle.

20       46.    The SUBJECT lingered for hours in the yard around the cabin as the

21  interlock on his car would not allow the car to start.  J.T. observed that the SUBJECT

22  looked ashamed and avoided eye contact with everyone in the group.  S.F. believed that

23  the SUBJECT was "shamefaced" and was behaving abnormally, avoiding others and

24  being quiet.  S.F. has interacted in person, by phone, or text with the SUBJECT nearly

25  every day for several years.

26       47.    The SUBJECT left the cabin just after noon.  The SUBJECT returned to the

27  SUBJECT PREMISES on Wednesday August 26, 2020.  The SUBJECT's father, Don

28  Kuna (Don) noticed that the SUBJECT was not himself; he was quiet and withdrawn.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1          48.     The rest of the group remained at the cabin until Thursday August 27,

2     2020.  MV1 barely left the cabin during that time and was not her usual outgoing, happy

3     self.

4          49.     S.F. called Don on August 27, 2020, and told him there had been an

5     incident involving the SUBJECT and MV1 during the trip.  S.F. said the SUBJECT had

6     "messed up."  Don and his wife, Cheryl, have been like second parents to S.F. and G.F.S.

7     since childhood.  Don told S.F. he could tell something had been wrong with the

8     SUBJECT since he returned.  After the SUBJECT left the cabin, S.F. did not hear from

9     the SUBJECT, which was very unusual.

10         50.     On August 28, 2020, MV1 disclosed the assault to a family friend S.M..

11    The friend is an emergency room nurse and has been a confidant of MV1.  The friend

12    took MV1 to the Auburn, Washington, Police Department to report the assault.  Officers

13    B. Cox and D. Hewin spoke with MV1 and her friend at the station.  MV1 stated "I did

14    not give him permission to touch me."

15         51.     The friend then took MV1 to Mary Bridge Hospital for a sexual assault

16    exam.  During the exam, the friend heard MV1 describe bruising caused by the

17    SUBJECT during the assault on her arms and ribcage. The friend then took MV1 home

18    and collected the still unwashed clothes MV1 had worn on the night of August 24-25,

19    2020.  Forensic analysis of this clothing is pending.

20         52.     After meeting with MV1 and her friend on August 28, 2020, Officer Cox

21    called J.T., G.F.S., S.F. and the SUBJECT.  During this interview, the SUBJECT claimed

22    he could not recall what happened that evening, alleging that he had blacked out from

23    alcohol and cocaine.  He said he could not remember many details about what happened

24    during the evening but was able to recall cleaning up MV1's vomit and putting her to

25    bed.  The SUBJECT then claimed G.F.J. took MV1 to an upstairs bedroom and put her to

26    bed while the SUBJECT remained downstairs.  Officer Cox asked the SUBJECT if MV1

27    had any reason to lie about the evening's events.  The SUBJECT answered, "I don't think

28    so" and added he thought they had a good relationship.  The SUBJECT was able to recall

1 | events before the assault and after.  The SUBJECT repeatedly asked Officer Cox, "where
2 | do we go from here?"

3 | 53.    The following morning, August 29, 2020, the SUBJECT departed the
4 | SUBJECT PREMISES early.  He did not tell his parents where he was going.

5 | 54.    On Saturday August 30, 2020, Detective Buie Arneson of the Auburn
6 | Police Department contacted ONP about the assault.

7 | 55.    By this time, rumors of the assault had spread through the friend group that
8 | the SUBJECT had assaulted MV1 on the trip.  Both Don and the SUBJECT's older
9 | brother, Andy Kuna (Andy), received messages advising them to be watchful of the
10 | SUBJECT.  This prompted the SUBJECT's family to realize that he had left early
11 | Saturday but had not returned on Sunday.

12 | 56.    The SUBJECT drove to Sekiu, Washington.  At 3:26 hours on Sunday
13 | August 30, 2020, a woman called 911 to report the SUBJECT tried to break into her
14 | trailer claiming to look for his phone, change, diesel, gas, and a rope.  She reported the
15 | SUBJECT appeared to be under the influence of something.  The SUBJECT told the
16 | responding Clallam County Sheriff's Deputy he had ingested marijuana and alcohol.  The
17 | Deputy helped the SUBJECT back to his vehicle and saw him get into a sleeping bag.
18 | The Deputy monitored the SUBJECT until approximately 4:30 a.m. on August 30, 2020.

19 | 57.    On Sunday August 30, 2020, at 10:55 a.m., the SUBJECT called G.F.S.,
20 | but he did not answer.  The SUBJECT's family believed he was suicidal.  On the evening
21 | of August 30, 2020, Don reported the SUBJECT missing to the King County Sheriff's
22 | Office.  Andy and his wife, Christy Kuna (Christy) searched for the SUBJECT along
23 | Forest Service roads near Greenwater, Washington, until early Monday morning.  Mid-
24 | morning on August 31, 2020, they found the SUBJECT by using the "find my phone"
25 | application as the SUBJECT's phone subscription was on his parents' plan.  The
26 | SUBJECT had driven south through Bremerton, Washington, and took himself to
27 | Western State Hospital in Tacoma, Washington, where he sought admission.

28 |

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

58.     Andy met the SUBJECT at Western State Hospital.  The SUBJECT told him, "[t]ell everyone I love them and I'm sorry" and "I talked to god and asked him to take the pain away for at least a day."  The SUBJECT told Andy "I would not do this, would not hurt anyone."  The SUBJECT told Andy there was a suicide note he wrote in his vehicle and said to him, "you won't want to read the note."

59.     The SUBJECT also told Andy he had ingested sleeping pills and alcohol intending to kill himself.  When he did not die, he decided instead to check himself into a mental health facility.  The SUBJECT was admitted to the Emergency Department at Allenmore Hospital in Tacoma, Washington, and then released the following day to Smokey Point Behavioral Center, a treatment facility in Marysville, Washington.

60.     On September 4, 2020, investigators spoke with Don.  Don had been in contact with the SUBJECT over the phone in recent days.  The SUBJECT told Don "I couldn't do this, I couldn't believe I would do this."  Don took the note from the vehicle and told investigators that he put it in his house for safekeeping and anticipates a warrant will be sought for it.  Don described the suicide note as being written on half a page and folded over.  Don stated the note reads in part, "[s]orry for what I did, I had a bad 2020, I'm sorry I never meant to hurt you, sorry I put you through this, I didn't mean to hurt anyone if this happened."

61.     Don said the SUBJECT was voluntarily admitted to the Smokey Point Behavioral Hospital and was being treated for depression and substance abuse addiction.

62.     Don believes Kuna attempted suicide because G.F.S. told him to do so on August 25, 2020.  However, the SUBJECT's apparent suicide attempt during the weekend of August 29, 2020, was closer in time to receiving the phone call from the Auburn Police Department on August 28, 2020 in which he learned he was being investigated for sexual assault of a child.

63.     Based on the aforementioned facts, I respectfully request that the Court issue a federal search warrant authorizing agents to search the SUBJECT PREMISES for

1  evidence, fruits and instrumentalities of violations of 18 U.S.C. §§ 2243 (Sexual Abuse

2  of a Minor) and 7.

3  **REQUEST FOR SEALING**

4      64.    Affiant requests that the Court order that all papers in support of this

5  application, including the affidavit and search warrant, be sealed until further order of the

6  Court. These documents discuss an ongoing criminal investigation that is neither public

7  nor fully known to the target of the investigation. Accordingly, there is good cause to

8  seal these documents because their premature disclosure may seriously jeopardize that

9  investigation.

10  **CONCLUSION**

11      65.    Based on the above facts, I believe there is probable cause for the issuance

12  of a search warrant for the search of the SUBJECT PREMISES and seizure of property

13  described in Attachment B that may be evidence, fruits and instrumentalities of violations

14  of 18 U.S.C. §§ 2243 (Sexual Abuse of a Minor) and 7.

15

16

17  _____
   Special Agent Susannah Lustig

18  Investigative Services Branch
   National Park Service

19

20      SUBSCRIBED and sworn to under oath before me telephonically and attestation

21  acknowledged pursuant to FRCP 4.1(b)(2) this 11th day of September, 2020.

22

23

24  _____

25  The Honorable Theresa L. Fricke
   United States Magistrate Judge

26

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**ATTACHMENT A**
**ITEMS TO BE SEARCHED**

SUBJECT PREMISES:

The SUBJECT PREMISES are located on a property identified as 32421 195th Avenue SE, Kent, WA 98042.  The SUBJECT PREMISES are limited to: a two story house painted white with black trim.  The front upper floor has three gabled windows facing the circular driveway.  As viewed from the front there is an attached garage to the left of the main house.  The number "32421" is posted on a free-standing mailbox at the entry to the circular drive.



Attachment A - 1

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Attachment A - 2

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

The following evidence that constitute evidence, fruits and instrumentalities of violations of 18 U.S.C. §§ 2243 (Sexual Abuse of a Minor) and 7:  A handwritten note that Donald Kuna removed from the SUBJECT's vehicle on or after August 25, 2020.

Attachment B - 1